SENTENCIA
Por medio de un recurso de Certiorari, se solicita que revisemos la sentencia emitida por el Tribunal de Apelacio-nes en este caso. En ella, el foro apelativo intermedio re-vocó una resolución de la Comisión Apelativa del Sistema de Administración de Recursos Humanos del Servicio Pú-blico (CASARH). Mediante ésta, CASARH dejó sin efecto la determinación de la Corporación del Centro de Bellas Artes (CBA), de denegarle a la peticionaria la reinstalación a un puesto de carrera, al momento de ser removida de un puesto de confianza.
Examinemos los hechos que originaron la controversia.
*868 I
La Sra. Constancia Ramos Román comenzó a trabajar en el servicio público en 1979, por medio de un nombra-miento transitorio como Técnica de Administración I en el Departamento de Transportación y Obras Públicas.(1) El 1 de septiembre de 1996, la señora Ramos Román comenzó a laborar en el CBA como empleada de confianza, en el puesto de Gerente de Administración. (2)
El 12 de noviembre de 2001, la señora Ramos Román fue separada de su puesto de confianza. Mediante una co-municación escrita, el entonces Gerente General del CBA, Sr. Carlos R. Alicea Cotto, le imputó a la señora Ramos Román actos y omisiones relacionados a ciertas transaccio-nes de personal, en violación a la Ley de Personal del Ser-vicio Público de Puerto Rico,(3) su Reglamento de Personal, y el Reglamento de Personal del Centro de Bellas Artes (CBA).
En particular, se le imputó violar el Art. 6 de la Ley Núm. 5, que requiere a los empleados “[r]ealizar eficiente-mente y con diligencia las tareas y funciones asignadas a su puesto y otras compatibles con éstas que se le asig-nen”(4) y “[c]umplir las disposiciones [de la Ley de *869 Personal], y las reglas y órdenes dictadas en virtud [de ésta]”.(5) Además, se le notificó que se le privaría de su derecho a la reinstalación a un puesto de carrera. En con-secuencia, se le formularon tres cargos a la señora Ramos Román. En el primer cargo se le imputó recomendar una modificación a la clase de Operador de Equipo de Entrada de Datos el 20 de noviembre de 1998. Esta modificación resultó en lo siguiente: (1) la creación de la clase de Asis-tente de Sistemas de Información y (2) el ascenso del Sr. Pedro Arzuaga a la nueva clase, sin haber obtenido la apro-bación de la clase por la Oficina de Recursos Humanos del Estado Libre Asociado (ORHELA).(6) Por ello, según este primer cargo, el señor Arzuaga fue ascendido a una clase que no formaba parte del plan de clasificación, razón por la cual su clasificación era nula.
En el segundo cargo se le imputó a la señora Ramos Román haber recomendado al Gerente General del CBA reclasificar el puesto de Secretaria de la Oficina de Servi-cios Generales. El fundamento para la reclasificación fue la evolución de funciones a base de nuevas tareas asigna-das a la Sra. Evelyn Calderón, quien ocupó el puesto de secretaria de la Oficina de Servicios Generales. Los actos imputados en este cargo datan de 9 de septiembre de 1999.
Por último, en el tercer cargo se le imputó a la señora Ramos Román recomendar el nombramiento regular de la Sra. Evelyn Covas como Oficial Administrativo el 9 de marzo de 2000. La señora Covas ocupaba hasta entonces un puesto de confianza como Secretaria del Gerente General, sin que hubiese ocupado previamente un puesto de ca-rrera en el CBA. Según este cargo, la reinstalación de un empleado de confianza al servicio de carrera está condicio-nada a que, antes de ocupar un puesto de confianza, el *870 empleado haya ocupado un puesto de carrera. A esos efec-tos, según este cargo, la señora Covas no había ocupado un puesto de carrera en el sistema de personal, previo a su nombramiento en el servicio de confianza en el CBA. Por ello, el CBA concluyó que la señora Covas no podía ser reinstalada a un puesto de carrera.
De acuerdo con las advertencias contenidas en la alu-dida carta de 12 de noviembre de 2002, la señora Ramos Román solicitó una vista informal ante el CBA para cues-tionar la separación de su puesto. Esta fue celebrada el 20 de noviembre de 2002. Finalmente, el 22 de enero de 2003, la peticionaria fue destituida de su puesto de confianza. Además, se le privó de su derecho a la reinstalación a un puesto de carrera.
El 28 de enero de 2003, la señora Ramos Román apeló su destitución ante la antigua Junta de Apelaciones del Sistema de Administración de Personal.(7) En esta apela-ción, la peticionaria impugnó la privación de su derecho a la reinstalación al servicio de carrera. Más adelante, con motivo de la aprobación de la Ley Núm. 184 de 3 de agosto de 2004, Ley para la Administración de los Recursos Hu-manos en el Servicio Público del Estado Libre Asociado de Puerto Rico,(8) la apelación de la peticionaria se tramitó a través de CASARH.(9)
Luego de varios trámites procesales, el 14 de julio de 2006, CASARH emitió una resolución para declarar “ha lugar” la apelación presentada por la peticionaria.(10) En su *871 resolución, CASARH adoptó las determinaciones de hechos siguientes:
A. Gerencia del señor Navas
El señor Navas fue Gerente General del CBA hasta el 16 de septiembre de 1997.(11) En esa fecha fue sucedido por el Sr. Francisco Girona, quien ocupó el cargo de Gerente General del CBA hasta el 31 de marzo de 2001.(12) Durante la gerencia del señor Navas, la señora Ramos Román su-pervisó la Oficina de Recursos Humanos en su carácter de Gerente de Administración hasta que el señor Navas fue sucedido por el señor Girona.(13)
El CBA tenía un diagrama de organización interno que nunca fue sometido para la aprobación de la Oficina de Gerencia y Presupuesto (OGP).(14) En algunas versiones del diagrama, la Oficina de Recursos Humanos se encon-traba “bajo la supervisión del Gerente de Administración, aunque en la práctica no era así”.(15)
El CBA operó con la anomalía de un plan de clasifica-ción y retribución implantado, pero no aprobado por OCALARH.(16) Por ello, desde septiembre de 1996 hasta septiembre de 1997, no se realizaron transacciones de personal relacionadas a aumentos de salarios, reclasificacio-nes o ascensos.(17)
Bajo la dirección del señor Navas, la señora Ramos Ro-mán llevó a cabo un análisis preliminar de todos los expe-dientes de empleados, con la colaboración de una funciona- *872 ria de OCALARH.(18) El estudio reveló que había una cantidad significativa de empleados cesanteables por nuli-dad de sus nombramientos.(19) Además, del estudio surgió “que existían empleados en el CBA que habían estado mu-chos años como empleados irregulares, pero no existían certificaciones de horas trabajadas que evidenciaran que habían acumulado las 1,800 horas durante tres años con-secutivos, según lo exigía la Ley [Núm.] 110 de 26 de junio de 1958, en adelante Ley 110, [conocida como la] Ley de Personal Irregular de Gobierno”.(20)
Asimismo, el informe reveló que los contratos de empleo no indicaban que eran por un nombramiento irregular de acuerdo con la Ley Núm. 110.(21) “[TJampoco existían certi-ficaciones de que sus servicios habían sido satisfactorios y de que cumplieran con todos los requisitos exigidos por la Ley 110 para otorgarles el derecho”.(22) Es decir, no se podía dar por hecho que los empleados con estatus irregular de empleo por tres años o más, cumplían automáticamente con los requisitos para ser empleados regulares.(23)
CASARH estimó probado que “[l]o primordial entonces fue resolver y establecer controles para continuar con el servicio y operación para lograr recaudar dinero para las operaciones diarias del CBA”.(24) Como parte de los cam-bios se confirieron nombramientos irregulares de acuerdo *873 con la Ley Núm. 110, supra(25) Posteriormente, se le otorgó el derecho a ser empleados regulares a aquellos empleados que cumplían con los requisitos expuestos en la ley.(26)
B. Gerencia del señor Girona
CASARH estimó como un hecho probado que a la lle-gada del señor Girona como Gerente General, la Directora de Recursos Humanos, la Sra. Mayra Rosich, le sometió las hojas de descripciones de los puestos de todos los emplea-dos activos a esa fecha, para que el señor Girona las firmase(27) No obstante, el señor Girona no firmó las “Ho-jas de Deberes”.(28) El problema financiero que afrontaba el CBA tenía mayor prioridad para el señor Girona, que con-seguir la aprobación del plan de clasificación y retribución. (29)
Por otra parte, CASARH estimó demostrado que el señor Girona despojó a la señora Ramos Román de la supervisión de la Oficina de Recursos Humanos, así como de otras fun-ciones propias de su puesto. (30) Posteriormente, entre 1998 y 1999, “el señor Girona contrató al señor Carlos Vélez para retomar el asunto de la preparación de los planes de clasificación y retribución”.(31) No obstante, el señor Vélez *874 “sólo corrigió y enmendó el borrador del plan que estaba implantado y funcionando en el CBA desde la gerencia del Sr. Alcides Ortiz [Ferrari] ”.(32) Más adelante, “el señor Vé-lez fue reclutado por el señor Girona para el puesto de Director de Recursos Humanos”.(33) CASARH determinó como un hecho que “[a] partir de ese reclutamiento y hasta su separación en diciembre del 2000, la apelante [señora Ramos Román] no supervisó la Oficina de Recursos Huma-nos, ya que el señor Vélez como empleado de confianza se reportaba directamente al señor Girona, Gerente General”. (Énfasis suplido.)(34)
Para “el mes de octubre de 2001 el único plan de clasi-ficación y retribución aprobado que tenía el CBA era el de la señora Carmen Junco en 1996”.(35) Todos los empleados de carrera y confianza en el CBA, a excepción de la apelante y su secretaria, tenían títulos de clasificación y sueldos a base de un plan sin aprobar”. (Énfasis suplido.)(36) El plan fue implantado por el señor Ortiz Ferrari, anterior Gerente General del CBA.(37) Es un hecho probado ante CASARH que “[e]Z CBA operaba y funcionaba a base de esa realidad organizacional y de esos empleados, con sus correspondien-tes títulos de clasificación y sueldos”. (Énfasis suplido.)(38)
*875 La señora Ramos Román “no era la autoridad nomina-dora” y “no le competía someter un plan o declarar nulas las transacciones y puestos existentes”. (Enfasis suplido.)(39) Tampoco tenía autoridad para obligar al Gerente General a ejecutar sus recomendaciones. (Enfasis suplido.)(40) Éstas “podían ser consideradas o no por el Gerente General, y estaban sujetas a la decisión final de éste”. (Énfasis suplido.)(41)
C. Cargos imputados a la señora Ramos Román
Los cargos responsabilizan a la señora Ramos Román de las acciones de personal tomadas como Supervisora de la Oficina de Recursos Humanos.(42) No obstante, “la realidad es que ejerció estas funciones de forma esporádica y cir-cunstancial”, ya que el señor Girona asumió, personal-mente, la supervisión de esa oficina tan pronto comenzó a trabajar en el CBA.(43)
El señor Girona, Gerente General para la fecha de los hechos en controversia, “nunca entrevistó, cuestionó, dis-cutió, conversó o investigó con la apelante [señora Ramos Román] sobre la intención o el motivo de las recomendacio-nes que la apelante hiciera relacionadas con movimiento de personal”.(44) Sin embargo, “[e]stas recomendaciones fueron la base para la destitución de la apelante”.(45)
Las transacciones se recomendaron al amparo del plan utilizado en la práctica e implantado en enero de 1996.(46) *876 Ello se debió a que los empleados estaban clasificados y muchos de ellos nombrados a base de ese plan.(47) En otras palabras, ese plan era el recurso que se utilizaba en el CBA para todas las transacciones de personal,(48)
CASARH determinó como un hecho, “[e]n cuanto a los cargos uno (1) y dos (2) sobre modificación de clase de ope-rador de equipo de entrada de Datos y Reclasificación de Oficial Administrativo, respectivamente, [que] ambas cla-ses existían en el plan sin aprobar, vigente en la práctica desde enero 1996”.(49) La señora Ramos Román “solamente recomendó la reclasificación de las clases, así como tran-sacciones específicas a la luz de éstas, a requerimiento del señor Girona, Gerente General. Ambas clases fueron modi-ficadas y aprobadas por el señor Girona”. (Énfasis suplido.)(50) La clase de Operador de Equipo de Entrada se reclasificó para atemperarla a la necesidad del CBA de es-tablecer el plan de mecanización implantado por OGR És-tos requerían un oficial a cargo de los asuntos de informá-tica, con unos requisitos exigentes y un nivel de puesto gerencial.(51)
Con relación al primer cargo, CASARH estimó probado que el señor Arzuaga, quien recibió el ascenso en contro-versia, “había asumido en la práctica desde hacía tiempo ... muchas de las funciones relacionadas con los sistemas de información”.(52) Igualmente, “[l]a clase de Oficial Admi-nistrativo fue revisada y modificada en términos de funcio-nes para hacerla más flexible y genérica, ya que la especi- *877 ficación de clase en el plan sin aprobar la limitaba a la Oficina del Gerente de Administración, lo cual tampoco se ajustaba a la realidad operacional del CBA”.(53)
Es un hecho probado ante CASARH que “[e]l señor Gi-rona quería tener una persona a cargo de los sistemas de computadoras, pero no consideraba oportuno reclutar un Director de Sistemas de Información tal y como lo definían la OGP y la OCALARH, ya que resultaba oneroso al CBA”.(54) Igualmente, “no se entendía que se justificara un nivel de puesto de esa categoría para una organización pe-queña y una red o sistema que no eran demasiado complicados”.(55) En este sentido, “[e]l señor Girona enten-día que se [le] debía otorgar la oportunidad a un recurso interno por lo que delegó dichas funciones al señor Pedro Arzuaga, quien aunque no tenía formación universitaria, tenía muchas aptitudes y habilidad para todo lo relacio-nado con sistemas de computadoras”.(56) Además, éste “ha-bía crecido profesionalmente dentro del CBA y siempre fue una persona muy colaboradora y resolutiva”.(57) Por ello, “el señor Girona entendió que lo más justo y sensato para el CBA era retener a este empleado con su valiosa expe-riencia y otorgarle a éste alguna mejora salarial y profesional”. (58)
CASARH entendió, como un hecho probado, que el Ge-rente General y la Directora de Recursos Humanos de en-tonces, firmaron los documentos de ambas especificaciones *878 de clases y su revisión final.(59) Además, era “evidente” que “no se podía someter a OCALARH una enmienda a una clase, de un plan que no estaba aprobado por ellos y ni siquiera radicado allí”.(60)
Con relación al tercer cargo, sobre la Recomendación de Nombramiento en el caso de la señora Covas, la señora Ramos Román “recomendó su nombramiento en un puesto de carrera, pero no indicó el procedimiento o el trámite a seguir”. (Énfasis suplido.)(61) Ello se debió a que esa era la responsabilidad del Director de Recursos Humanos, quien debía “analizar todas las recomendaciones que recibía y efectuar las mismas, en este caso el nombramiento, a la luz de su análisis y conforme [a] las leyes y reglamentos aplicables”. (Énfasis suplido.)(62) “[L]a Oficina de Recursos Humanos no estaba bajo la competencia de la señora Ramos Román directamente en esa época ni tenía el poder o autoridad para imponer transacción alguna”. (Énfasis suplido.)(63) Por ello, la señora Ramos Román “se limitó a recomendar el nombramiento de la señora Covas, que la cualificaban en principio para ocupar la plaza, pero no im-partió instrucciones sobre el trámite que había que seguir”. (64) Según la prueba testifical, “se podía proceder con un reclutamiento especial y emitir una convocatoria interna, como se hizo en otras ocasiones”.(65) Este análisis y trámite es responsabilidad de la Oficina de Recursos *879 Humanos. (66) La señora Ramos Román se enteró de la forma cómo se tramitó el nombramiento de la señora Covas mediante la carta de formulación de cargos que se le entregara.(67)
CASARH añadió que “[n]o existía norma ni reglamento, en virtud del cual, la acción de ‘recomendar y permitir’ fueran causas suficientes para aplicar una acción discipli-naria como la que se le aplicó a la apelante”.(68) En conse-cuencia, CASARH concluyó lo siguiente:
[L]os hechos son claros y los cargos imputados son inmeri-torios por lo que procede la reinstalación [de la señora Ramos Román] a su puesto de carrera, ya que de no haber mediado la actuación ultra vires [sic] de parte de la gerencia del CBA, la apelante continuaría como empleada de carrera luego de su separación del servicio de confianza. Es decir, el incumpli-miento con las normas y reglamentos para transacciones de personal en el CBA eran única y exclusivamente de la Junta de Directores o del Gerente General que ésta designase. Que la Gerencia interpretara que la antedicha responsabilidad re-caía sobre las recomendaciones hechas por la apelante estaba fuera del marco de autoridad delegado a la CBA y al Gerente General. Por tanto la imputación de cargos inmeritorios por parte de la Gerencia del CBA contra la apelante constituyó una actuación ultra vires [sic].
Es por todo lo anterior, que entendemos que la apelante no tenía el poder ni la autoridad para inducir a cualquiera de los Gerentes Generales que dirigieron el CBA a tomar acciones ni obligarlos a ello. A la apelante se le asignó total responsabili-dad en los casos donde recomendó transacciones, aún sin tener ella la autoridad para aprobar y efectuar las mismas.
Para realizar cualquier transacción de personal se necesita la aprobación del Director de Recursos Humanos y la del Ge-rente General, como autoridad nominadora, por lo cual no po-demos ser tan ingenuos para creer que ellos no tenían conoci-miento de las transacciones de personal que se le imputaron a la apelante, más aún ellos aprobaron dichas transacciones, *880 como pudimos comprar [sic] en el expediente de personal de la Sra. Evelyn Calderón.
La apelante fue sancionada para [sic] asumir las consecuen-cias de la implantación de un plan no aprobado, decisión y acción sobre la cual no tuvo participación alguna, ya que ocu-rrió antes de su llegada al CBA.(69)
Conforme a lo anterior, CASARH determinó que las ale-gaciones imputadas no estaban apoyadas en datos precisos que demostraran que la peticionaria faltó a sus deberes. Finalmente, concluyó que la señora Ramos Román fue cul-pada y destituida injustamente.
Inconforme con la determinación de CASARH, el 14 de septiembre de 2006, el CBA presentó un recurso de revi-sión administrativa ante el Tribunal de Apelaciones. En su recurso, el CBA argumentó que CASARH erró al concluir que la destitución de la señora Ramos Román fue injusti-ficada y contraria a Derecho. De igual forma, argüyó que CASARH erró al ordenar la reinstalación de la peticionaria a un puesto de carrera y al decretar el pago retroactivo de salarios dejados de devengar. En particular, alegó que CA-SARH erró en la apreciación de la prueba oral. Ello, por entender que surge del expediente administrativo que la peticionaria violó sus deberes como empleada pública, al haber realizado recomendaciones de personal irregulares o nulas.
El CBA reconoció que, de ordinario, la peticionaria ten-dría derecho a ser reinstalada a un puesto de carrera una vez cesara en la posición de confianza. Sin embargo, según argumentó el CBA, la conducta de la peticionaria fue de gravedad suficiente para privarle de retornar a un puesto de carrera.
El 30 de junio de 2008, el Tribunal de Apelaciones dictó Sentencia para revocar la resolución dictada por *881 CASARH. (70) El foro apelativo intermedio concluyó que CA-SARH erró en la aplicación del derecho a los hechos del caso. Ello, a pesar de aceptar como ciertas y correctas to-das las determinaciones de hechos esbozadas por la reso-lución de CASARH, por estar sostenidas por el expediente administrativo.
El Tribunal de Apelaciones concluyó que CASARH inci-dió al no evaluar si la señora Ramos Román incumplió los deberes y las funciones que le imponía la Ley Núm. 5, supra, respecto al principio del mérito. Asimismo, concluyó que la peticionaria recomendó unas transacciones de personal a sabiendas de que éstas eran ilegales por violar las disposiciones de la Ley Núm. 5, supra, y de los reglamentos aplicables.
Inconforme con el dictamen emitido por el Tribunal de Apelaciones, la señora Ramos Román acude ante nos para señalar la comisión de los errores siguientes:
Erró el Honorable Tribunal de Apelaciones al concluir que la destitución de la señora Constancia Ramos fue justificada.
Erró el Tribunal de Apelaciones al concluir que como cuestión de Derecho la señora Constancia Ramos incumplió los deberes y funciones de su cargo al recomendar las transacciones de personal relacionadas a los empleados Pedro Arzuaga, Evelyn Calderón y Evelyn Covas, justificándose la denegatoria a su reinstalación a puesto de carrera.
Erró el Honorable Tribunal de Apelaciones al concluir que las transacciones de personal relacionadas a los empleados Pedro Arzuaga, Evelyn Calderón y Evelyn Covas fueron ilegales.
El 20 de marzo de 2009 expedimos el mandamiento de certiorari en este caso. Con el beneficio de la comparecen-cia de ambas partes, procedemos a resolver.
*882 II
A. Las determinaciones administrativas gozan de una presunción de regularidad y corrección.(71) Esta presunción debe sostenerse por los tribunales, salvo que logre ser de-rrotada mediante la identificación de evidencia sustancial que obre en el expediente administrativo(72)
El expediente administrativo constituye la base exclu-siva para la decisión de la agencia y para la revisión judicial de ésta.(73) Por ello, la parte que impugna judicial-mente las determinaciones de hechos de una agencia administrativa tiene el peso de probar que “ ‘existe otra prueba en el récord que reduzca o menoscabe el valor pro-batorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración’ (Enfasis suplido y en el original. )(74)
La facultad del foro judicial para revisar las determina-ciones de hechos de las agencias está limitada por la See. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.).(75) Esta sección establece que “[l]as determinaciones de he-chos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo”.(76)
*883 Hemos definido el concepto “evidencia sustancial” como aquella evidencia relevante que una mente razonable po-dría aceptar como adecuada para sostener una conclu-sión.(77) Ello no requiere que, a la luz de la prueba que obre en los autos, la decisión de la agencia refleje la única con-clusión lógica a la que podría llegar un juzgador. El criterio rector en estos casos será la razonabilidad de la determi-nación de la agencia, luego de considerarse el expediente administrativo en su totalidad.(78) Más aún, cuando una determinación de una agencia esté sustentada por eviden-cia sustancial que obre en el expediente del caso, los tribu-nales deben abstenerse de sustituir el criterio de la agencia por el judicial.(79)
La revisión judicial de las decisiones administrativas se circunscribe a determinar si la actuación de la agencia es arbitraria, ilegal o tan irrazonable que constituya un abuso de discreción.(80) Al enfrentarse a una petición para revisar judicialmente una determinación administrativa, el tribunal debe analizar si conforme al expediente administra-tivo: (1) el remedio concedido fue razonable; (2) las deter-minaciones de hechos están sostenidas por evidencia sustancial, y (3) las conclusiones de derecho del organismo administrativo son correctas.(81)
Existe una práctica judicial claramente establecida de conceder gran consideración y deferencia a las decisiones de los foros administrativos.(82) Sin embargo, ello no signi-fica una abdicación de la función revisora del foro *884 judicial.(83) Por el contrario, los tribunales tienen el deber de proteger a los ciudadanos contra posibles actuaciones ultra vires, inconstitucionales o arbitrarias de las agencias. Ahora bien, “el foro judicial podrá sustituir el criterio del organismo administrativo por el propio sólo en aquellas ocasiones que no encuentre una base racional que funda-mente la actuación administrativa”.(84)
Por otra parte, las conclusiones de derecho de las agen-cias administrativas son “revisables en todos sus aspectos por el tribunal”.(85) El razonamiento detrás de esta dispo-sición es que los tribunales gozan de peritaje en cuanto a las cuestiones jurídicas, por lo cual no se adelanta ningún fin público, otorgándole deferencia a la agencia en cuanto a este aspecto.
No obstante, ello no quiere decir que los tribunales de-ben descartar livianamente las conclusiones de derecho he-chas por las agencias administrativas. Nuestra jurispru-dencia interpretativa señala que los tribunales deben dar gran peso y deferencia a la aplicación e interpretación que hagan las agencias con respecto a las leyes y los reglamen-tos que éstas administran.(86) Ello, porque al tratarse de áreas del Derecho que manejan a diario, las agencias de-sarrollan un conocimiento especializado que no debe ser menospreciado.(87)
El criterio de revisión, en cuanto a las interpretaciones jurídicas hechas sobre los estatutos que maneja la agencia debe ser también de razonabilidad.(88) Ahora bien, la defe-rencia que merecen estas interpretaciones legales cede ante una actuación irrazonable o ilegal que justifique que el tribunal ejerza su función revisora en protección de la *885 ciudadanía. (89) Las conclusiones de derecho que no impli-quen interpretaciones de las leyes y los reglamentos admi-nistrados por la agencia, ni que caigan en la rúbrica de su especialidad, pueden ser revisados por los tribunales sin limitación alguna. (90)
B. La Corporación del CBA es una corporación pública creada mediante la Ley Núm. 43 de 12 de mayo de 1980, según enmendada.(91) El organismo rector del CBA es una Junta de Directores, que corresponde a la misma Junta de Directores del Instituto de Cultura Puertorriqueña. El CBA cuenta con un Gerente General que funge como su primer ejecutivo. Este cuenta con los poderes, las respon-sabilidades y las facultades administrativas que le han sido delegadas por la Junta de Directores del Instituto de Cultural(92)
El Art. 2 de la Ley Orgánica del CBA,(93) dispone que esta corporación tiene el poder para “administrar su propio sistema de personal y nombrar todos sus funcionarios, agentes y empleados”. Asimismo, el CBA tiene el poder para asignarles a sus empleados “las funciones que estime convenientes”.(94) Según este artículo, el CBA es un admi-nistrador individual.
Conforme a lo anterior, el CBA es un administrador individual al cual le aplicaban las disposiciones de la Ley Núm. 5, supra. Según mencionado, esta ley fue derogada por la Ley Núm. 184, supra. No obstante, para la fecha de los hechos en controversia, la versión estatutaria vigente para la administración de los recursos humanos en el ser-vicio público era la Ley Núm. 5, supra. En consecuencia, *886 debemos examinar y aplicar las disposiciones de la ley a esta controversia.
C. La Ley de Personal del Servicio Público de Puerto Rico (Ley Núm. 5) supra, fue aprobada con el propósito de establecer un solo sistema de personal para los empleados públicos. Ésta tenía como política pública establecer el mé-rito como el principio que regiría el servicio público en Puerto Rico. Éste promueve que las personas que sirven al gobierno sean las más aptas para ello y que todo empleado sea seleccionado en consideración al mérito y a su capacidad. Asimismo, la Ley Núm. 5, supra, pretendía evi-tar que las transacciones de personal estuviesen indebida-mente motivadas por discrimen por razón de raza, color, sexo, nacimiento, edad, origen o condición social, o por ideas políticas o religiosas.(95)
La Ley Núm. 5, supra, creó un sistema unitario de ad-ministración para el personal del servicio público que in-cluía una Administración Central y los Administradores Individuales. Los Administradores Individuales se regían por sus propios reglamentos, los cuales tenían que estar conformes al principio de mérito y ser aprobados por OCAP. Según esto, le correspondía a OCAP aprobar los reglamen-tos y planes de clasificación de los administradores indivi-duales para que fuesen puestos en vigor. Además, OCAP tenía la facultad de declarar nula cualquier regla que so-metieran los administradores individuales que fuera con-traria a la Ley Núm. 5, supra, y a las normas y los regla-mentos promulgados por la aludida oficina. (96)
La See. 4.2 de la Ley Núm. 5, supra, disponía, en lo pertinente, lo siguiente:
Como instrumento eficaz para la consecución de los progra-mas de gobierno, las agencias del sistema de personal serán responsables de establecer y mantener una estructura racio- *887 nal de funciones que propenda a la mayor uniformidad posible y que sirva de base para las diferentes acciones de personal. Para lograr este propósito se establecen las siguientes dispo-siciones que cumplirán las autoridades nominadoras según les corresponda:
(7) Será responsabilidad de la Oficina, en el caso de la Ad-ministración Central y de cada autoridad nominadora, en el caso de los Administradores Individuales, crear, eliminar, con-solidar y modificar las clases de puesto comprendidos en el plan de clasificación. El Director de Personal será responsable de emitir normas respecto a la creación, eliminación, consoli-dación y modificación de las clases de puesto para guiar el mantenimiento de los planes de clasificación. (Enfasis suplido.)(97)
La See. 4.4 de la Ley Núm. 5, supra, disponía sobre los ascensos, traslados y descensos lo siguiente:
(1) La Administración Central o cada Administrador Individual, según sea el caso, determinará las clases de puestos que debido a las necesidades particulares de la agencia o a la na-turaleza de las funciones de las clases de puesto requieren que se cubran mediante el ascenso de empleados. Para cubrir estas clases de puestos se utilizará el mecanismo de los ascensos, conforme a lo siguiente:
(a) Los empleados en puestos de carrera ascenderán me-diante exámenes que podrán consistir de pruebas escritas, orales, físicas, de ejecución, evaluaciones de experiencia y pre-paración, evaluaciones de supervisor, análisis del record del trabajo, resultados de adiestramientos u otros. (Énfasis suplido.)(98)
En lo que respecta al reclutamiento y la selección de personal, la Sec. 4.3(11) de la Ley Núm. 5, supra, proveía para que se establecieran, mediante reglamento, procedi-mientos especiales de reclutamiento y selección “[c]uando no se disponga de registros de elegibles apropiados para determinada clase de puestos y la urgencia del servicio lo justifique”.(99) La Ley Núm. 5, supra, reconoció como parte *888 del principio de mérito el derecho de reinstalación. La See. 5.10 de la referida ley disponía, en lo pertinente, lo si-guiente:
Los empleados de confianza serán de libre selección y remoción. Serán igualmente de confianza aquellos que aunque siendo de libre selección sólo pueden ser removidos por justa causa por disposición de ley o aquéllos cuyo nombramiento sea por un término prefijado por ley.
(a) Todo empleado que tenga la condición de empleado regular en el Servicio de Carrera y pase al Servicio de Confianza tendrá derecho absoluto a ser reinstalado en un puesto igual o regular al último que ocupó en el Servicio de Carrera, a menos que su remoción del puesto de confianza se haya efectuado me-diante formulación de cargos, y disponiéndose, que será acree-dor a todos los beneficios en términos de clasificación y sueldo que se haya extendido a la plaza que ocupaba, durante el tér-mino en que sirvió en la posición de confianza. (Enfasis suplido.)(100)
D. Para instrumentar la Ley Núm. 5, supra, OCAP adoptó el Reglamento de Personal: Areas Esenciales al Principio de Mérito,(101) según enmendado, Reglamento Núm. 2663 del Departamento de Estado, 10 de jimio de 1980. Este Reglamento aplica a toda la Rama Ejecutiva del Gobierno de Puerto Rico, incluyendo a las corporaciones públicas y a los municipios.(102)
La See. 5.5 del Reglamento Núm. 2663, págs. 2-3, dis-pone sobre el derecho de reinstalación lo siguiente:
Si un empleado en el servicio de carrera con [e]status regular pasa al servicio de confianza y posteriormente se separa del mismo, tendrá derecho absoluto a ser reinstalado con categoría de empleado de carrera, en un puesto igual o similar al que ocupaba en el servicio de carrera al momento en que pasó al servicio de confianza. Deberá ser reinstalado preferiblemente *889 en la misma agencia donde sea separado. La Administración Central y cada Administrador Individual reglamentarán la forma de implementar esta disposición. (Enfasis suplido.)(103)
De las disposiciones citadas se desprende que el derecho de reinstalación estaba disponible para aquel empleado de confianza que provenía del servicio de carrera! El propósito de ello era hacer justicia al empleado de carrera que se veía expuesto a perder la seguridad de su empleo al acep-tar una posición en el servicio de confianza. (104)
E. En cumplimiento con las disposiciones menciona-das, el CBA adoptó el Reglamento de Personal de la Cor-poración del Centro de Bellas Artes (Reglamento del CBA).(105) Este reglamento fue aprobado por OCAP, el 27 de septiembre de 1989, quien tenía la facultad para declarar nula cualquier regla que sometieran los administradores individuales que fuera contraria a la Ley Núm. 5, supra, y a los reglamentos promulgados por esta Oficina. (106) En este caso, OCAP aprobó el Reglamento del CBA y no de-claró nula ninguna de sus disposiciones reglamentarias. Por ello, para una adjudicación adecuada de la controver-sia, contrario al análisis realizado por el Tribunal de Ape-laciones, no podemos soslayar las disposiciones del Regla-mento del CBA.
La Sec. 5.1 del aludido Reglamento dispone sobre el Plan de Clasificación lo siguiente:
El Gerente General establecerá un Plan de Clasificación para los puestos de carrera previa la aprobación de la Oficina Central de Administración de Personal. Establecerá las nor-mas y los procedimientos necesarios para la administración de dicho plan, en armonía con el plan de retribución que se esta-blezca y los reglamentos aplicables a este último.
*890 El Plan de Clasificación reflejará la situación de todos los puestos en el servicio de carrera de la agencia a mía fecha determinada, constituyendo así un inventario de los puestos autorizados a la agencia en todo momento. Para lograr que el Plan de Clasificación sea un instrumento de trabajo adecuado y efectivo en la administración de personal, se mantendrá al día registrando los cambios que ocurran en los puestos, de forma tal que en todo momento el plan refleje exactamente los hechos y condiciones reales presentes, y mediante la actualiza-ción de las especificaciones de clase y las asignaciones de pues-tos a las clases. Se establecerán por lo tanto, los mecanismos necesarios para hacer que el Plan de Clasificación sea susceptible a una revisión y modificación continua de forma que cons-tituya una herramienta de trabajo efectiva. (Enfasis suplido. )(107)
En lo que respecta a la clasificación de puestos, la See. 5.6 del Reglamento del CBA, supra, dispone que “[t]odos los puestos se asignarán oficialmente a las clases correspondientes. No existirá ningún puesto sin clasificación. Bajo ninguna circunstancia podrá persona al-guna recibir nombramiento en un puesto que no haya sido clasificado previamente”.(108)
La reclasificación de los puestos está regulada en la alu-dida See. 5.6 del modo siguiente:
Se justificará reclasificar todo puesto cuando esté presente cualquiera de las siguientes situaciones:
1. Clasificación Original Errónea
En esta situación no existe cambio significativo en las fun-ciones del puesto, pero se obtiene información adicional que permite corregir una apreciación inicial equivocada.
2. Modificación al Plan de Clasificación
En esta situación no existen necesariamente cambios signi-ficativos en las especificaciones de los puestos, pero en el pro-ceso de mantener al día el Plan de Clasificación mediante la consolidación, segregación, alteración, creación y eliminación de clases, surge la necesidad de cambiar la clasificación de algunos puestos.
*891 3. Cambio Sustancial en Deberes, Responsabilidad o Autori-dad
Es un cambio deliberado y sustancial en la naturaleza o el nivel de las funciones del puesto, que lo hace subir o bajar de jerarquía o la ubica en una clase distinta al mismo nivel.
4. Evolución del Puesto
Es el cambio que tiene lugar con el transcurso del tiempo en los deberes, autoridad y responsabilidades del puesto que oca-siona una transformación del puesto original.(109)
Por otro lado, la See. 5.8 sobre cambio de deberes, Res-ponsabilidades o Autoridad, del Reglamento de Personal del CBA dispone, en lo pertinente, lo siguiente:
Se podrá disponer cambios en los deberes, responsabilida-des o autoridad de los puestos con arreglo a las siguientes normas:
1. Todo cambio responderá a la necesidad o conveniencia de los programas gubernamentales: ningún cambio tendrá moti-vación arbitraria ni propósitos disciplinarios.
2. Conforme a lo anterior, la Corporación establecerá sus propios criterios conforme a sus particularidades. (Enfasis suplido.)(110)
El Reglamento del CBA también regula lo referente a los ascensos en la Sec. 7.1 del Art. 7 de la manera si-guiente:
1. Objetivo de los Ascensos
El objetivo de los ascensos es atraer al mejor personal para cubrir puestos públicos; ofrecer oportunidades para mayor pro-greso de sus servidores según se desarrollan sus capacidades para prestar buenos servicios-, mantener un alto nivel de satis-facción y ejecución entre los empleados y lograr retener en el servicio a los más capacitados.
*892 2. Normas sobre Ascensos
Con el fin de establecer sistemas que hagan viable el as-censo de los empleados de carrera, regirán las siguientes nor-mas:
b) La Corporación determinará las clases de puesto que se requiere se cubran mediante el ascenso de empleados. Esta determinación se hará a base de la naturaleza de las funciones de las clases de puestos y a las necesidades particulares de la Corporación. Las normas específicas sobre lo establecido ante-riormente estarán contenidas en las normas de reclutamiento que se establezcan para cada clase de puesto. (Énfasis suplido.)(111)
A su vez, la misma Sec. 7.1(3)(b) del Reglamento del CBA, supra, dispone sobre ascensos sin oposición lo si-guiente:
b) Por exigencias excepcionales y especiales se entenderá la necesidad de reclutar personal por razón de las siguientes si-tuaciones:
(1) Asignación o atención de nuevas funciones o progra-mas;
(2) Ampliación de los servicios que presta la agencia;
(3) Necesidad de reclutar personal que logre mantener la continuidad en la prestación de los servicios sin necesidad de mayor orientación',
(5) Urgencia por cubrir un puesto vacante que hace impracticable el procedimiento ordinario )(112)
III
Nos corresponde resolver si una empleada que ocupa un puesto de confianza, que de acuerdo con la Ley Núm. 5, supra, no le compete aprobar, crear o modificar clases de puestos para la corporación pública para la cual labora, puede ser privada de su derecho a la reinstalación en un puesto de carrera tras su destitución como empleada de *893 confianza, por recomendar transacciones de personal que no forman parte de sus funciones. Ello, a pesar de que la empleada de confianza no tenía el poder para obligar al Director de Recursos Humanos o al Gerente General (au-toridad nominadora) a actuar conforme a sus recomenda-ciones y, además, cuando a estos funcionarios les corres-pondía analizar toda recomendación recibida y aprobar o rechazar la transacción de personal en cuestión.
A. En el primer cargo, el CBA le imputó a la señora Ramos Román: haber recomendado la modificación de la clase de Operador de Equipo de Entrada de Datos a la clase de Asistente de Sistemas de Información; haber reco-mendado el ascenso del señor Arzuaga a la clase modifi-cada sin haber obtenido la aprobación de la clase por OR-HELA, y que la clase de Asistente de Sistema de Información no formaba parte del plan de clasificación de la agencia, razón por la cual su nombramiento era nulo. No le asiste la razón.
La señora Ramos Román recomendó la modificación de la clase en controversia, según las discreciones conferidas a las agencias administrativas mediante la Ley Núm. 5, supra, y la Sec. 5.1, y subsiguientes, del Reglamento de Personal del CBA, supra. Estas disposiciones permiten rea-lizar los cambios necesarios en la clasificación de puestos, al amparo de los hechos y las condiciones reales de las agencias, de manera que el plan de clasificación sea una herramienta efectiva de trabajo. El Reglamento del CBA permite que se realicen cambios en los deberes y las res-ponsabilidades de los puestos, siempre que ello responda a la necesidad o conveniencia del CBA.(113) Por ello, según su Reglamento, el CBA tiene la facultad para establecer sus propios criterios conforme a su realidad particular.(114)
Las recomendaciones efectuadas por la señora Ramos *894 Román surgen como consecuencia de la necesidad del CBA de implantar el programa de mecanización promulgado por la OGR(115) Ante la necesidad operacional del CBA, la se-ñora Ramos Román optó por recomendar la modificación de un puesto existente en el plan de clasificación utilizado en el CBA desde 1996.(116) Es decir, la peticionaria utilizó como herramienta de trabajo el plan de clasificación exis-tente internamente en el CBA para recomendar las tran-sacciones de personal en controversia. De las determina-ciones de hechos de CASARH surge que el propósito de las recomendaciones fue mantener actualizado, aunque fuese internamente, el plan de clasificación que se utilizaba.
No puede escaparse de nuestro análisis la realidad particular con la cual operaba el CBA. Todos los empleados de carrera y de confianza, salvo la señora Ramos Román y su secretaria, tenían títulos de clasificación a base de un plan sin aprobar, el cual fue implantado con anterioridad a la llegada de la peticionaria. Es decir, como cuestión de hecho el CBA operó con la realidad de un plan de clasificación y retribución implantado, pero no aprobado por OCALARH. Por ello, era “evidente” que “no se podía someter a OCA-LARH una enmienda a una clase, de un plan que no estaba aprobado por ellos y ni siquiera radicado allí”.(117)
En lo que respecta al ascenso del señor Arzuaga, la See. 4.4 de la Ley Núm. 5, supra, es clara a los efectos de que cada administrador individual tiene la facultad de deter-minar las clases de puestos que debido a las necesidades particulares requieren que se cubran mediante el ascenso de empleados. El propio Reglamento del CBA dispone que se puede reclutar personal, cuando hay una asignación de *895 nuevas funciones o programas, o cuando hay alguna nece-sidad de reclutar personal que logre mantener la continui-dad en la prestación de los servicios. (118) A su vez, dispone que se puede reclutar personal por razones excepcionales y especiales cuando hay: una asignación de nuevas funciones o programas; necesidad de reclutar personal para lograr la continuidad en la prestación de los servicios, o una urgen-cia por cubrir un puesto vacante que hace impracticable el procedimiento ordinario.(119)
Conforme a lo anterior, y por la necesidad urgente del CBA de poner a funcionar el plan de mecanización del sis-tema de información promulgado por la OGP, la señora Ramos Román recomendó el ascenso del señor Arzuaga. El ascenso del señor Arzuaga se realizó al evaluar su expe-riencia, habilidades y su desempeño en el trabajo.(120) Este empleado contaba con las destrezas y experiencias necesa-rias del puesto, además de un excelente expediente, siendo al momento de la recomendación la persona encargada de operar los sistemas nuevos de computadora.(121)
De los hechos probados ante CASARH surge palmaria-mente que el Gerente General del CBA, señor Girona, no consideraba oportuno reclutar a un director de sistemas de información, según definido por OGP y OCALARH, porque ello resultaba oneroso ante la precaria situación económica del CBA.(122) Además, no se justificaba un puesto de tal categoría para una organización pequeña que operaba con un sistema de información que no era complejo.(123) Por *896 ello, el mismo gerente general delegó en el señor Arzuaga este trabajo.(124)
Conforme a lo anterior, concluimos que el Tribunal de Apelaciones erró al adjudicarle responsabilidad a la señora Ramos Román por modificar la clase en controversia y por recomendar el ascenso del señor Arzuaga. Asimismo, el foro apelativo intermedio incidió al concluir que la clase de Asistente de Sistema de Información no formaba parte del plan de clasificación del CBA, cuando de las propias deter-minaciones de hechos de CASARH surge que ésta sí existía en el plan utilizado en el CBA para las transacciones de personal. Si bien es cierto que el CBA, como administrador individual, incumplió con su obligación de someter el plan de clasificación para la aprobación de OCALARH, no es menos cierto que la señora Ramos Román realizó la reco-mendación en controversia según el plan utilizado en el CBA para las transacciones de personal. Por ello, y ante la realidad del CBA, el cual no podía someter a OCALARH enmiendas a las clases por no contar con un plan aprobado por esta entidad, no se justifica la imposición de una me-dida disciplinaria tan severa como la privación del derecho a la reinstalación a un puesto de carrera.
B. En el segundo cargo, el CBA le imputó a la señora Ramos Román haber violado las disposiciones de la Ley Núm. 5, supra, al recomendar la reclasificación del puesto de la señora Calderón, de Secretaria de la Oficina de Ser-vicios Generales a Oficial Administrativo por evolución de sus funciones. El CBA alegó que la reclasificación recomen-dada por la señora Ramos Román no procedía por evolu-ción de funciones y que la clase de Oficial Administrativo no existía en el plan de clasificación utilizado por el CBA.
De entrada, es un hecho probado ante CASARH que la clase de Oficial Administrativo sí existía en el plan de cla- *897 sificación utilizado e implantado en el CBA desde enero de 1996.(125) El CBA no ha probado que exista otra evidencia en el expediente que impida llegar a la conclusión de que esta determinación de hecho fue razonable.(126) Por ello, ésta debe ser sostenida por los tribunales. Resolvemos, pues, que el Tribunal de Apelaciones erró al concluir que la clase de Oficial Administrativo no existía en el plan de cla-sificación del CBA.
La clase de Oficial Administrativo fue revisada y modi-ficada en términos de funciones para hacerla más flexible y genérica. Ello, porque la especificación de clase en el plan de clasificación del CBA la limitaba a la Oficina del Ge-rente de Administración, cosa que tampoco se ajustaba a la realidad operacional del CBA.(127) La recomendación efec-tuada por la señora Ramos Román permitía mayores opor-tunidades para resolver temporeramente problemas orga-nizacionales del CBA.(128) Además, esta clase fue modificada y aprobada por el señor Girona, Gerente General del CBA para la fecha de los hechos en controversial(129) Ello quedó establecido, claramente, en las determinaciones de hechos de CASARH.
Por otra parte, la recomendación de la clase en contro-versia se fundamentó en la evolución del puesto. Cierta-mente, el fundamento para la recomendación fue erróneo, toda vez que la reclasificación realmente procedía por un cambio sustancial en deberes. Sin embargo, este error fue *898 corregido por la Oficina de Recursos Humanos del CBA, quien en el descargue de sus funciones tenía el deber de tramitar el proceso de reclasificación.(130) En específico, el Director de la Oficina de Recursos Humanos del CBA tenía la responsabilidad de analizar todas las recomendaciones que recibía, para luego efectuarlas conforme a las leyes y los reglamentos aplicables.(131) Además, la señora Ramos Román no tenía poder ni autoridad para imponer transac-ción alguna de personal.
El referido error de la señora Ramos Román no es fun-damento para la privación de su derecho a la reinstalación a un puesto de carrera. La destitución de un empleado pú-blico es una medida drástica que procede en casos extremos cuando la falta es de eminente gravedad o cuando exista un estado de emergencia fiscal declarado mediante ley. (132) Este caso no demuestra una violación extrema en los deberes de un funcionario público. Por el contrario, el error cometido por la señora Ramos Román fue un error administrativo, el cual fue corregido sin mayores consecuencias por la Oficina de Recursos Humanos del CBA, previo a la reclasificación de la señora Calderón. En consecuencia, el Tribunal de Apelaciones incidió al determinar que el error en el funda-mento para la recomendación efectuada por la señora Ramos Román, fue una violación a la Ley Núm. 5, supra, de tal magnitud que justificaba privarle de su derecho a la reinstalación a un puesto de carrera.
C. En el tercer cargo, el CBA le imputó a la señora Ramos Román haber recomendado el nombramiento regular, en reinstalación, de la señora Covas como Oficial Ad-ministrativo, sin que previamente ésta hubiese ocupado un *899 puesto de carrera. El CBA apoyó su contención en que la señora Covas sólo podía ocupar un puesto regular me-diante el proceso de reclutamiento, esto es, convocatoria previa, divulgación, examen y registro de elegibles.
El Tribunal de Apelaciones concluyó que este nombra-miento se solicitó mediante el procedimiento de reinstala-ción, a pesar de que ésta no procedía porque la señora Co-vas era una empleada de confianza. El foro apelativo intermedio entendió que la señora Ramos Román violó la See. 4.3 de la Ley Núm. 5, supra. Finalmente, concluyó que el puesto de Oficial Administrativo no estaba comprendido en el plan de clasificación.
Es un hecho probado ante CASARH que la señora Ramos Román recomendó el nombramiento de la señora Co-vas a un puesto de carrera, “pero no indicó el procedi-miento o el trámite a seguir”. (Enfasis suplido.)(133) Ello se debió a que esa era la responsabilidad del Director de Re-cursos Humanos.(134) Una vez se recomendaba un recluta-miento, la Oficina de Recursos Humanos tenía el deber ministerial de determinar la forma como se iba a tramitar el nombramiento. Además, la oficina aludida tenía la res-ponsabilidad de realizar el proceso de convocatoria, divul-gación, examen y registro de elegibles. Esta responsabili-dad no recaía en la peticionaria. Es decir, la señora Ramos Román recomendó a la señora Covas, pero el proceso de reclutamiento y selección era responsabilidad de la Oficina de Recursos Humanos y no de la Gerente de Adminis-tración.
La señora Ramos Román no supervisaba la Oficina de Recursos Humanos en esa época ni tenía autoridad para imponer transacción de personal alguna.(135) De acuerdo *900 con la prueba testifical, “se podía proceder con un recluta-miento especial y emitir una convocatoria interna, como se hizo en otras ocasiones”. (136) Pero este análisis era respon-sabilidad de la Oficina de Recursos Humanos.(137) Es im-portante señalar, que el entonces Gerente General del CBA, señor Girona, aprobó esta transacción y la refirió al Director de Recursos Humanos, sin que la peticionaria tu-viera ulterior participación.
Salta a la vista y surge de las propias determinaciones de hecho de CASARH, que la señora Ramos Román se en-teró de que el nombramiento de la señora Covas se tramitó como una reinstalación mediante la carta de formulación de cargos que se le entregara.(138) Por ello, resulta inaudito que se le haya imputado violación alguna por una recomen-dación que no hizo.
El Tribunal de Apelaciones concluyó también que la se-ñora Ramos Román violó la See. 4.3 de la Ley Núm. 5, supra. Esta disposición atendía los asuntos relacionados al reclutamiento y la selección de personal. Estos asuntos, según consta en las determinaciones de hechos de CA-SARH, son responsabilidad de la Oficina de Recursos Hu-manos del CBA y no del Gerente de Administración, puesto que ocupaba la aquí peticionaria. Resolvemos, pues, que el Tribunal de Apelaciones erró al concluir que la señora Ramos Román recomendó el nombramiento regular en reins-talación de la señora Covas violando la See. 4.3 de la Ley Núm. 5, supra.
Por otra parte, el Tribunal de Apelaciones concluyó que el puesto de Oficial Administrativo no estaba comprendido en el Plan de Clasificación. No obstante, de las determina-ciones de hechos de CASARH surge que las recomendacio-nes en controversia se realizaron según el plan de clasifi- *901 cación utilizado en el CBA desde antes de la llegada de la peticionaria al CBA.(139) Por lo tanto, erró el foro apelativo intermedio en este asunto.
IV
En este caso, de acuerdo con la Ley Núm. 5, supra, quien tenía el deber y la autoridad para crear o modificar las clases de puesto era la autoridad nominadora, en este caso el señor Girona como Gerente General del CBA y no la señora Ramos Román como Gerente de Administración. La peticionaria podía recomendar las clases de puestos que requerían modificaciones o, incluso, el personal que, a su entender, estaba mejor capacitado para asumir determi-nado puesto. Por ello, la señora Ramos Román no puede ser responsabilizada por los nombramientos en controversia, toda vez que no era la encargada del área de Recursos Hu-manos a la fecha cuando se cometieron las alegadas faltas y tampoco era la autoridad nominadora, de acuerdo con la Ley Orgánica del CBA y con la Ley Núm. 5, supra. Adviér-tase, que la Ley Núm. 5, supra, define “Autoridad nomina-dora” como “cualquier funcionario o agencia con facultad legal para hacer nombramientos para puestos en el Gobiemo”.(140) Según probado ante CASARH, la señora Ramos Román no tenía esta autoridad. La función de la se-ñora Ramos Román se limitaba a efectuar recomendacio-nes que podían ser consideradas o no por la autoridad nominadora y la Oficina de Recursos Humanos.(141) A la peticionaria “no le competía someter un plan o declarar nu-las las transacciones y puestos existentes”, y “no tenía auto-ridad para obligar al Gerente General a que ejecutara sus *902 recomendaciones”. (Énfasis suplido.)(142) Éstas estaban su-jetas a la decisión final del Gerente General. (143)
Por lo anterior, podemos afirmar que “[l]a responsabili-dad del Director de Recursos Humanos era analizar todas las recomendaciones que recibía y efectuar las mismas, en este caso [los] nombramiento [s], a la luz de su análisis y conforme las leyes y reglamentos aplicables”.(144) Ésta eva-luación fue realizada, toda vez que se conservaron en el CBA los documentos firmados por el Gerente General y la Directora de Recursos Humanos que demostraban que se había revisado y aprobado finalmente los referidos movi-mientos de personal recomendados por la peticionaria.(145) Los aludidos documentos establecían claramente las res-pectivas especificaciones de clases de puesto que se modificaban.(146)

Mayor importancia reviste el hecho de que no existía norma ni reglamento según el cual la acción de “recomen-dar y permitir” fueran causas suficientes para aplicar una acción disciplinaria como la que se le aplicó a la señora Ramos Román. Conforme a lo anterior, los cargos imputa-dos a la peticionaria no tienen mérito.

Luego de considerar los autos de este caso, concluimos que la determinación de CASARH fue razonable y que está apoyada por evidencia sustancial que surge del expediente, razón por la cual no debemos sustituir el criterio de la agencia por el nuestro, (147) La actuación de CASARH no fue arbitraria, ilegal o tan irrazonable que constituya un abuso de discreción.
*903 Existe una práctica judicial claramente establecida de conceder una gran consideración y deferencia a las decisio-nes de los foros administrativos.(148) Las agencias adminis-trativas tienen una presunción de regularidad y corrección. Esta presunción no ha sido rebatida en este caso. Ello se colige de la propia sentencia del Tribunal de Apelaciones, al establecer que acepta como ciertas y correctas las deter-minaciones de hechos esbozadas por CASARH, por estar esencialmente sostenidas por el expediente administrativo y la transcripción de la vista.(149)
Según la Ley Núm. 5, supra, la señora Ramos Román es acreedora del derecho a ser reinstalada en un puesto de carrera, igual o similar al que ocupaba antes de ser reclu-tada para el puesto de confianza en el CBA. Además, tiene derecho al pago retroactivo de los salarios dejados de per-cibir como empleada regular, desde la fecha cuando se le impidió la reinstalación a un puesto de carrera.(150) Para privar a la señora Ramos Román del derecho a la reinsta-lación a un puesto de carrera, se requiere una causa justi-ficada y fundamentada en cargos sostenibles en alguna re-glamentación o ley, o que demuestren la severidad necesaria para justificar la privación de este derecho, lo que claramente no ocurrió en el caso de autos.
Así pues, si el CBA había perdido la confianza deposi-tada en la peticionaria, la única alternativa que tenía era reinstalarla en su antiguo puesto de carrera o uno similar, no destituirla y privarle de éste. La privación del derecho a la reinstalación a un puesto de carrera es una medida drás-tica que sólo procede en casos extremos cuando la falta es de eminente gravedad o cuando exista un estado de emer-gencia fiscal declarado legislativamente.(151)
*904 V
Por los fundamentos expuestos, revocamos la sentencia emitida por el Tribunal de Apelaciones. Resolvemos que la señora Ramos Román tiene el derecho a ser reinstalada a un puesto de carrera igual o similar al que ocupaba antes de ser reclutada en el puesto de confianza en el CBA. Asi-mismo, determinamos que la peticionaria tiene el derecho al pago retroactivo de sus salarios y beneficios como em-pleada de carrera desde el momento cuando se hizo efectiva la privación de su derecho a la reinstalación a un puesto de carrera.
Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada Señora Fiol Matta concu-rrió sin opinión escrita. El Juez Presidente Señor Hernán-dez Denton disintió sin opinión escrita. La Jueza Asociada Señora Rodríguez Rodríguez disintió con una opinión escrita.
(.Fdo.) Aida Ileana Oquendo Graulau Secretaria del Tribunal Supremo
— O —

 En diciembre de 1984, mientras laboraba en el Departamento de Transpor-tación y Obras Públicas (DTOP), fue ascendida a Técnica de Administración IV. El 1 de julio de 1986 obtuvo un nombramiento para el mismo puesto, pero esta vez en el servicio de carrera. Posteriormente, en marzo de 1987, la peticionaria obtuvo un traslado al Cuerpo de Voluntarios al Servicio de Puerto Rico como Técnica de Admi-nistración IV. El 16 de junio de 1987 obtuvo un traslado al Departamento de Estado como Técnica de Administración IV. En esta última agencia fue ascendida a Técnica de Administración V, luego a Funcionaría Ejecutiva de Presupuesto I y, en diciembre de 1989, a Funcionaría Ejecutiva de Presupuesto II.

 No existe controversia entre las partes de que la peticionaria mantuvo el derecho a la reinstalación a un puesto de carrera, a pesar del traslado a un puesto de confianza. La señora Ramos Román ocupó de forma interina la posición de Gerente General del CBA en dos ocasiones. La primera ocasión fue por un período de dos meses de duración; en específico, desde 16 de julio de 1997 a 16 de septiembre de 1997. La segunda ocasión fue por un periodo aproximado de siete meses de duración; en particular, desde 10 de abril de 2001 a 22 de octubre de 2001.

 Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. see. 1301 et seq. (ed. 2000)).

 3 L.P.R.A. see. 1371(3) (ed. 2000).

 3 L.P.R.A. see. 1371(8) (ed. 2000).

 Esta oficina era conocida anteriormente como la Oficina Central de Asesora-miento Laboral y de Administración de Recursos Humanos (OCALARH). Previo a ello OCALARH era conocida como la Oficina Central de Administración de Personal (OCAP).

 El 5 de noviembre de 2003, la representación legal de la señora Ramos Ro-mán enmendó la apelación.

 Ley Núm. 184 de 3 de agosto de 2004 (3 L.P.R.A. see. 1461 et seq.).

 La Ley Núm. 184, supra, derogó la Ley Núm. 5 dé 14 de octubre de 1975, conocida como Ley de Personal de Servicio Público de Puerto Rico. Además, la Ley Núm. 184, supra, creó a CASARH. Esta comisión tiene jurisdicción sobre las apela-ciones surgidas como consecuencia de acciones o decisiones de los administradores individuales y de los municipios en los casos que se especifican en la Sec. 13.13 de la Ley Núm. 184 (3 L.P.R.A. sec. 1468(1)).

 CASARH adoptó e incorporó en su resolución el informe rendido por la Leda. Laura Rechani Ydrach, Oficial Examinadora de CASARH, a quien se le delegó la apelación de la peticionaria.

 Determinación de Hecho Núm. 7 de CASARH, Apéndice del certiorari, pág. 73.

 íd.

 Determinación de Hecho Núm. 23 de CASARH, Apéndice del certiorari, pág. 77.

 Determinación de Hecho Núm. 21 de CASARH, Apéndice del certiorari, pág. 77.

 íd.

 Determinación de Hecho Núm. 24 de CASARH, Apéndice del certiorari, pág. 77.

 íd.

 Determinación de Hecho Núm. 25 de CASARH, Apéndice del certiorari, pág. 77.

 Determinación de Hecho Núm. 26 de CASARH, Apéndice del certiorari, pág. 77.

 Determinación de Hecho Núm. 28 de CASARH, Apéndice del certiorari, págs. 77-78.

 Determinación de Hecho Núm. 29 de CASARH, Apéndice del certiorari, pág. 78.

 íd.

 íd.

 Determinación de Hecho Núm. 30 de CASARH, Apéndice del certiorari, pág. 78.

 Determinación de Hecho Núm. 31 de CASARH, Apéndice del certiorari, pág. 78.

 íd.

 Determinación de Hecho Núm. 34 de CASARH, Apéndice del certiorari, págs. 78-79.

 Determinación de Hecho Núm. 36 de CASARH, Apéndice del certiorari, pág. 79.

 Determinaciones de Hechos Núm. 36 y 37 de CASARH, Apéndice del certio-rari, pág. 79.

 Determinación de Hecho Núm. 36 de CASARH, Apéndice del certiorari, pág. 79.

 Determinación de Hecho Núm. 38 de CASARH, Apéndice del certiorari, pág. 79. La participación de la señora Ramos Román en el proceso se limitó a ciertas consultas del señor Vélez, quien objetaba continuamente las recomendaciones de la señora Ramos Román sobre los aspectos que se le consultaban referentes a los planes. Determinación de Hecho Núm. 40 de CASARH, Apéndice del certiorari, pág. 79.

 Determinación de Hecho Núm. 41 de CASARH, Apéndice del certiorari, pág. 79. Del expediente ante nuestra consideración no surge el periodo de tiempo durante el cual el señor Ortiz Ferrari fue gerente del CBA.

 Determinación de Hecho Núm. 43 de CASARH, Apéndice del certiorari, pág. 80.

 Determinación de Hecho Núm. 44 de CASARH, Apéndice del certiorari, pág. 80.

 Determinación de Hecho Núm. 49 de CASARH, Apéndice del certiorari, pág. 80.

 Determinación de Hecho Núm. 50 de CASARH, Apéndice del certiorari, págs. 80-81. En el caso de la señora Ramos Román, “el puesto de confianza era tal y como estaba definido en el Plan de Clasificación y Retribución de Confianza, que había sido aprobado por ... OCAP, durante la incumbencia de la señora Carmen Junco como Gerente General”. Determinación de Hecho Núm. 51 de CASARH, Apén-dice del Certiorari, pág. 81.

 íd.

 Determinación de Hecho Núm. 52 de CASARH, Apéndice del certiorari, pág. 81.

 Determinación de Hecho Núm. 53 de CASARH, Apéndice del certiorari, pág. 81.

 Determinación de Hecho Núm. 54 de CASARH, Apéndice del certiorari, pág. 81.

 íd.

 Determinación de Hecho Núm. 20 de CASARH, Apéndice del certiorari, pág. 76.

 íd.

 Determinación de Hecho Núm. 15 de CASARH, Apéndice del certiorari, págs. 74-75.

 íd.

 Determinación de Hecho Núm. 55 de CASARH, Apéndice del certiorari, pág. 81.

 íd.

 íd.

 Determinación de Hecho Núm. 56 de CASARH, Apéndice del certiorari, pág. 81.

 Determinaciones de Hechos Núm. 57 y 58 de CASARH, Apéndice del certio-rari, pág. 81.

 Determinación de Hecho Núm. 59 de CASARH, Apéndice del certiorari, págs. 81-82.

 Determinación de Hecho Núm. 60 de CASARH, Apéndice del certiorari, pág. 82.

 Determinación de Hecho Núm. 61 de CASARH, Apéndice del certiorari, pág. 82.

 Determinación de Hecho Núm. 64 de CASARH, Apéndice del certiorari, pág. 82.

 íd.

 Determinación de Hecho Núm. 65 de CASARH, Apéndice del certiorari, págs. 82-83.

 íd.

 íd. Como parte de la propuesta de mecanización aprobada por OGP para el CBA, el señor Arzuaga fue autorizado a tomar un adiestramiento sobre los nuevos programas y sistemas de computadoras. Determinación de Hecho Núm. 66 de CA-SARH, Apéndice del certiorari, pág. 83.

 Estos documentos se conservaron internamente y se encuentran archivados en la Oficina de Recursos Humanos del CBA.

 Determinación de Hecho Núm. 68 de CASARH, Apéndice del certiorari, pág. 83.

 Determinación de Hecho Núm. 69 de CASARH, Apéndice del certiorari, pág. 83.

 Determinación de Hecho Núm. 70 de CASARH, Apéndice del certiorari, pág. 83.

 Determinación de Hecho Núm. 71 de CASARH, Apéndice del certiorari, págs. 83-84.

 íd.

 Determinación de Hecho Núm. 72 de CASARH, Apéndice del certiorari, pág. 84.

 íd.

 Determinación de Hecho Núm. 73 de CASARH, Apéndice del certiorari, pág. 84.

 Determinación de Hecho Núm. 74 de CASARH, Apéndice del certiorari, pág. 84.

 Resolución de CASARH de 12 de julio de 2006, págs. 18-19, Apéndice del certiorari, págs. 89-90.

 El archivo en autos de la copia de la notificación de sentencia data del 18 de julio de 2008.

 Pacheco v. Estancias, 160 D.P.R. 409, 431 (2003); Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750, 761 (1999).

 López Echevarría v. Adm. Sist. Retiro, 168 D.P.R. 749, 752 (2006); Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987).

 Torres v. Junta Ingenieros, 161 D.P.R. 696, 708 (2004); Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 280 (1999).

 Ramírez v. Depto. de Salud, 147 D.P.R. 901, 905 (1999), citando a Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 131 (1998).

 3 L.P.R.A. see. 2175.

 íd. Véanse, además: Rebollo v. Yiyi Motors, 161 D.P.R. 69, 76-77 (2004); Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 75 (2000); Domínguez v. Caguas Expressway Motors, 148 D.P.R. 387, 397 (1999).

 Ramírez Rivera v. Depto. de Salud, supra, pág. 905; Misión Ind. P.R. v. J.P., supra, pág. 131; Hilton Hotels v. Junta Salario Mínimo, 74 D.P.R. 670, 687 (1953).

 Otero v. Toyota, 163 D.P.R. 716, 727-728 (2005).

 Otero v. Toyota, supra, pág. 728; Reyes Salcedo v. Policía de P.R., 143 D.P.R. 85, 95 (1997).

 Torres v. Junta Ingenieros, supra, pág. 708; Fuentes y otros v. A.R.Pe., 134 D.P.R. 947, 953 (1993).

 Pacheco v. Estancias, supra, pág. 431; P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269, 281 (2000); Mun. de San Juan v. J.C.A., supra, págs. 279-280.

 Otero v. Toyota, supra, pág. 727; Rebollo v. Yiyi Motors, supra, pág. 77.

 Rivera Concepción v. A.R.Pe., 152 D.P.R. 116, 122-123 (2000).

 Rebollo v. Yiyi Motors, supra, pág. 78.

 3 L.P.R.A. see. 2175.

 Asoc. Vec. H. San Jorge a. U. Med. Corp., supra, pág. 75.

 Rivera v. A & C Development, 144 D.P.R. 450, 461 (1997).

 Véase Pacheco v. Estancias, supra, pág. 432.

 íd., pág. 433.

 Misión Ind. P.R. v. J.P., supra, pág. 132; Rivera Rentas v. A & C Development, supra, pág. 461.

 18 L.P.R.A. see. 1161 et seq.

 18 L.P.R.A. sec. 1161b.

 18 L.P.R.A. see. 1161a.

 íd.

 3 L.P.R.A. see. 1311(1) (ed. 2000).

 3 L.P.R.A. see. 1347 (ed. 2000).

 3 L.P.R.A. see. 1332. (ed. 2000).

 3 L.P.R.A. see. 1334 (ed. 2000).

 3 L.P.R.A. see. 1333 (ed. 2000).

 3 L.P.R.A. see. 1350 (ed. 2000).

 Reglamento Núm. 2186 de 30 de noviembre de 1976, según enmendado por el Reglamento Núm. 2663 de 17 de marzo de 1980.

 Reglamento Núm. 2663 sólo excluye de su aplicación a los empleados de las agencias y corporaciones públicas que funcionan como empresas o negocios pri-vados y de aquellas otras cuyos empleados tienen derecho a negociar colectivamente.

 See. 5.5 del Reglamento Núm. 2663, supra.

 Véase Fidalgo Colón v. A.D.T., 112 D.P.R. 1, 7 (1982).

 Reglamento de Personal de la Corporación del Centro de Bellas Artes de 27 de septiembre de 1989 (Reglamento del CBA).

 3 L.P.R.A. see. 1347 (ed. 2000).

 Reglamento del CBA, supra, págs. 5-6.

 Reglamento del CBA, supra, pág. 12.

 Id., págs. 13-14.

 Reglamento del CBA, supra, pág. 16.

 íd., págs. 48-49.

 íd., págs. 49-50.

 Sección 5.8 del Reglamento del CBA, supra, pág. 16.

 íd.

 Véanse: Determinaciones de Hechos Núm. 59, 64 y 66 de CASARH, Apén-dice del certiorari, págs. 81-83.

 Determinación de Hecho Núm. 55 de CASARH, Apéndice del certiorari, pág. 81.

 Determinación de Hecho Núm. 68 de CASARH, Apéndice del certiorari, pág. 83.

 Sec. 7.1(3)(b) del Reglamento del CBA, supra.

 íd.

 3 L.P.R.A. see. 1334 (ed. 2000). Además, mediante éste se cumplió con los objetivos de los ascensos, según lo dispuesto en la Sec. 7.1 del Art. 7 del Reglamento del CBA, supra.

 Determinación de Hechos Núm. 60 de CASARH, Apéndice del certiorari, pág. 82.

 Determinación de Hecho Núm. 64 de CASARH, Apéndice del certiorari, pág. 82.

 íd.

 Determinación de Hecho Núm. 65 de CASARH, Apéndice del certiorari, págs. 82-83.

 Determinaciones de Hechos Núm. 55 y 56 de CASARH, Apéndice del cer-tiorari, pág. 81.

 Ramírez v. Depto. de Salud, supra, pág. 905; Misión Ind. P.R. v. J.P., supra, pág. 131.

 Determinación de Hecho Núm. 61 de CASARH, Apéndice del certiorari, pág. 82.

 Determinación de Hecho Núm. 62 de CASARH, Apéndice del certiorari, pág. 82. Adviértase, que según el Reglamento del CBA, supra, se justifica reclasificar cualquier puesto, cuando surge la necesidad de cambiar la clasificación de alguno de éstos para mantener actualizado el plan de clasificación, de manera que éste sea un instrumento eficaz para las operaciones del CBA.

 Determinación de Hecho Núm. 58 de CASARH, Apéndice del certiorari, pág. 81.

 véase Determinaciones de Hechos Núm. 70-72 de CASARH, Apéndice del certiorari, págs. 83-84.

 véase Determinación de Hecho Núm. 70 de CASARH, Apéndice del certio-rari, págs. 83.

 Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010); Rodrigo v. Tribunal Superior, 101 D.P.R. 151, 167 (1973); Lebrón v. Junta de Personal, 100 D.P.R. 164 (1971).

 Determinación de Hecho Núm. 69 de CASARH, Apéndice del certiorari, pág. 83.

 Determinación de Hecho Núm. 70 de CASARH, Apéndice del certiorari, pág. 83.

 Determinación de Hecho Núm. 71 de CASARH, Apéndice del certiorari, págs. 83-84.

 Determinación de Hecho Núm. 72 de CASARH, Apéndice del certiorari, pág. 84.

 íd.

 Determinación de Hecho Núm. 73 de CASARH, Apéndice del certiorari, pág. 84.

 Determinación de Hecho Núm. 55 de CASARH, Apéndice del certiorari, pág. 81.

 3 L.P.R.A. see. 1411 (ed. 2000).

 Determinación de Hecho Núm. 45 de CASARH, Apéndice del certiorari, pág. 80.

 Determinaciones de Hechos Núms. 53 y 54, Apéndice del certiorari, pág. 81.

 íd.

 Determinación de Hecho Núm. 70 de CASARH, Apéndice del certiorari, pág. 83.

 Determinación de Hecho Núm. 68 de CASARH, Apéndice del certiorari, pág. 83.

 íd.

 Otero v. Toyota, supra, pág. 728; Reyes Salcedo v. Policía de P.R., supra, pág. 95.

 Otero v. Toyota, supra, pág. 727; Rebollo v. Yiyi Motors, supra, pág. 77.

 Véase Apéndice, pág. 19.

 Hernández v. Mun. de Aguadilla, 154 D.P.R. 199, 203-204 (2001).

 Rodrigo v. Tribunal Superior, supra, pág. 167; Lebrón v. Junta de Personal, supra; Domínguez Castro et al. v. E.L.A. I, supra.